## IN RE: THOMAS F. MANGAN

May Term, 1943.

Present: MOULTON, C. J., SHERBURNE, BUTTLES, STURTEVANT and JEFFORDS, JJ.

Opinion filed June 24, 1943.

*Alban J. Parker,* Attorney General, for the State.

*Wayne C. Bosworth* for the respondent.

SHERBURNE, J. The original presentment charges the respondent with falsely and fraudulently preparing a draft of a will for Mary A. Lamb, and procuring the same to be executed by her as her last will and testament by the exercise of undue influence, and thereafterwards propounding the document for probate well knowing that it was not her free act and deed and not her last will and testament, and with converting various sums of money belonging to the said Lamb or her estate to his own use. An answer was filed and the facts were found by a commission.

■ At the opening of the hearing before the commission the attorney general stated that he had been in conference with respondent's attorney, and that after the introduction of certain exhibits and the transcripts of the testimony of the respondent and of certain named witnesses given in prior proceedings he would rest his case, and respondent's attorney agreed that the case might be so presented and waived all formalities. Later the attorney general offered the transcript of the testimony of two additional witnesses upon a material point, which was received over the objection and exception of the respondent, not that it was incompetent, but because in violation of the foregoing understanding, which the respondent characterizes as a stipulation. If a stipulation, it sufficiently appears that the attorney general had by inadvertence overlooked the testimony of these two witnesses. The rule is that a trial court may, in the exercise of a sound judicial discretion and in the furtherance of justice, relieve parties from stipulations they have entered into in the course of judicial proceedings, and that the determination of the trial court will not ordinarily be interfered with, except where a manifest abuse of discretion is disclosed. 25 RCL, Stipulations, para. 7; *Fayston* v. *Richmond,* 25 Vt 446, 449. Nothing appears to show an abuse of discretion on the part of the commission in receiving this evidence, and the exception is not sustained.

Although in disposing of the foregoing charges relative to the will the commissioners state that "having in mind the rule that in order to justify disbarment the case must be clear and free from doubt" (See *In re Haddad,* 106 Vt 322, 326, 173 A 103), they are unable to find those charges made out by the requisite measure of proof, the respondent excepts to all the findings made, claiming that the commissioners have in no way indicated in their report that the facts found are established by the requisite degree of proof. It may well be that it would have been better to so separately state, but we are clearly satisfied that the expression used indicates that all the findings made are so established.

The other exceptions to the report are inadequately briefed. In fact we have had to search the files to discover what these exceptions are. However, owing to the importance of the case, we are giving them thorough consideration.

In order to present an accurate setting upon which to weigh the

findings relative to the charges of conversion it is necessary to incorporate herein some of the subordinate findings relative to the will. In our statement based upon these findings and upon the findings relative to the charges of conversion we shall only use findings unexcepted to, except in those cases where we point out that a particular finding was excepted to and rule upon the exception. The respondent was admitted to the Vermont Bar in 1934. He was elected grand juror for the City of Rutland in March, 1935, and served in that capacity for four years. He was elected state's attorney of Rutland County in 1938, and was completing his second term in that office when these charges were preferred. Up to 1939, he had a good reputation in his home community as to moral character, honesty and professional integrity. In the latter part of April or early in May, 1939, the respondent was consulted by Mary A. Lamb relative to the closing of her sister's estate, of which she was administratrix, and to the preparation of a will for herself, and he accepted employment in both these matters, and continued to act as her attorney and legal adviser until her death on June 27, 1940. At no time before such employment had Miss Lamb consulted with him as an attorney on any of her affairs or business. When drafting a will for Miss Lamb the respondent learned of a previous document, executed by her during the February or March preceding with all the formalities of a will, which set forth her then wishes. For convenience this will be referred to as No. 1 Will. Under its provisions she devised her home in Rutland to a nephew for life with remainder over to two nieces, and made specific bequests of personal property and $4,487.00 in money, and left the residue of her estate in four equal shares to three nieces and to a friend. The will drafted by the respondent, hereinafter referred to as No. 2 Will, was executed by Miss Lamb in the presence of three witnesses at her home on May 13, 1939. The respondent was present at the time of execution and had procured the witnesses. Under this will several heirs were in effect disinherited, the specific bequests of money were reduced to $3,697.00, and all the residue was given to the respondent.

We quote from finding VI:

> "We find that on May 13, 1939, the date of the execution of No. 2 Will, the respondent knew that

Mary A. Lamb was possessed of a substantial amount of property, to-wit, her home at 409 West Street, Rutland (as to which she was the owner of an undivided one-half and was the sole heir of the estate of her sister, Kate Lamb, as to the other half), valued at from Three Thousand to Four Thousand Dollars, and a saving deposit in the Rutland Savings Bank of Rutland, amounting to between Nine Thousand and Ten Thousand Dollars. We find also that the respondent knew that there was another savings account in the Marble Savings Bank in Rutland, of approximately Nine Thousand Dollars."

The respondent excepts to the last sentence about the account in the Marble Savings Bank on the ground that there is no evidence to support it. It is supported by his original signed answer filed when he had no attorney of record, and by his testimony in his deposition in perpetuam. Because he testified differently in later proceedings does not make the finding open to attack.

We quote from finding VIII:

"We find Miss Lamb, at the time of the execution of No. 2 Will was approximately 77 years of age, in poor health and of doubtful mental capacity, although there is little evidence before us which would warrant a finding of lack of testamentary capacity. She was alone in the world except for a brother with whom she associated but little, a nephew and some nieces. She had recently lost through death her sister Kate, with whom she had lived alone for many years, who was her inseparable companion and upon whom she relied almost wholly in her business affairs. Kate's death was a great shock to her.

"While she had known the respondent practically all his life, we are satisfied her interest in him prior to April, 1939, was casual in nature. He went to school to her sister Kate, and there is evidence that she supported his candidacies for city grand juror

and for state's attorney. She employed as her attorney, however, the late Charles E. Novak until his death on April 4, 1939, and No. 1 Will was prepared in his office by Thomas O'Brien, of Rutland. Her sister Kate's estate was being handled through the same office. It was not until after Mr. Novak's death and after becoming dissatisfied with the progress being made in the settlement of Kate's estate, that she employed the respondent, and then only upon the suggestion of George Lorette, who had acted as handyman about the home for the Lamb sisters."

We quote from finding IX:

"We find that prior to May 9, 1939, Mary A. Lamb had on deposit in a savings account in the Rutland Savings Bank approximately Nine Thousand Six Hundred Dollars ($9,600.) ; that at the time the respondent was first employed by Miss Lamb, the deposit stood in the name of Mary A. Lamb or Mary E. McKeogh and to the survivor. Miss McKeogh, however, had declined to accept from Miss Lamb the gift of this deposit or a joint interest in the same, as an individual, but had accepted it as Field Secretary for the Catholic Charities, as indicated by the fact that she signed the signature card at the bank, "Mary E. McKeogh, F.S." On May 9, 1939, the respondent procured, or caused to be procured, a change in the title of said deposit, whereby the name of Mary E. McKeogh was taken from the bank book and the account, so that after May 9, 1939, and until events hereinafter related, the account stood in the sole name of Mary A. Lamb.

"Shortly before May 9, the respondent stated to Mrs. Layden and Mrs. Ballard that Minnie McKeogh's name was on Mary Lamb's bank books and that the first thing he was going to do was to get Minnie McKeogh's name off Mary Lamb's bank book. We find that Mary McKeogh was by her intimate friends frequently called Minnie McKeogh. At the

same time he stated that he was then going to make a will for Miss Lamb and that if any of her relatives tried to break that will that he was going to make for Miss Lamb, they would have a very tough time.

"About July 1, 1939, Miss Lamb received notice from Rutland Savings Bank that the bank would not, after July 1, 1939, continue to pay interest on any deposit in its bank in excess of $5000. On or about July 1, 1939, the respondent procured, or caused to be procured by Miss Lamb, the withdrawal of all the money in the Rutland Savings Bank in excess of Five Thousand Dollars ($5000.00), and being in fact Four Thousand Five Hundred Eighty-one Dollars and ninety-one cents ($4581.91). This was done by an order signed by Miss Lamb at the Rutland Hospital, where an officer of the bank was called to attend to the transaction. The bank check, payable to Mary A. Lamb for the above amount was delivered to her and was shortly thereafter endorsed by her in blank and delivered to the respondent. He deposited the check in a new account in the Rutland Trust Company in his name as Trustee for Mary A. Lamb. He claims that this money was given to him by Miss Lamb. After the death of Miss Lamb, the remaining part of this account, being a little more than Four Thousand Dollars ($4,000.00) was transferred by the respondent into a joint account of himself and his wife. He had spent from the account between Five Hundred and Six Hundred Dollars for his own use, but he testified, and we find, that as to all such expenditures he consulted Miss Lamb and she approved. His handling of this account, the way he made the deposit, and the way he made withdrawals from it, when considered in connection with the other evidence, are inconsistent with the claim of a gift. We find that there was no gift and that the money deposited by the respondent in the Rutland Trust Company, as above stated, was in fact, and in law, the property of Mary A. Lamb so long as she

lived, and subject to her direction and control, and upon her death became a part of her estate.

"We further find that following the death of Mary A. Lamb, the respondent converted this fund to his own use, by causing the same to be withdrawn and redeposited in the name of himself and his wife."

The respondent excepts to the last sentence on the ground that it is a conclusion of law and is entirely unsupported by the findings of fact and by the evidence. The prior facts found in the finding, unexcepted to, support the conclusion, and the exception is without merit.

We quote from finding X:

"Miss Lamb, on or about the date of the execution of No. 2 Will, had on deposit with the Marble Savings Bank a sum of money in excess of Nine Thousand Dollars ($9,000.00), that between the date of the execution of No. 2 Will and March 6, 1940, various withdrawals were made therefrom so that on March 6, 1940, there was a balance on said account with the Marble Savings Bank of approximately Eight Thousand, Six Hundred Dollars ($8,600.00) and on, to wit, March 6, 1940, the said Mangan procured or caused to be procured the transfer of the Marble Savings Bank account into the name of Mary A. Lamb and/or Thomas F. Mangan, or the survivor; that at various times before the death of Miss Lamb on June 27, 1940, various withdrawals were made from the Marble Savings Account by the said Thomas F. Mangan, all for the purpose of paying current expenses for Mary A. Lamb, as more fully hereinafter appears, so that on June 27, 1940, there was approximately Seven Thousand Dollars ($7,-000.00) left in this account in the Marble Savings Bank; and further that during the banking hours of June 27, 1940, and before the death of Mary A. Lamb, the said Thomas F. Mangan withdrew all of the then balance in the Marble Savings Bank from

the joint account and redeposited said money in the Marble Savings Bank in an account in the name of Thomas F. Mangan.

"We further find that when this joint account was created by Mary A. Lamb, it was not a gift to the respondent nor intended as such, but was for convenience in handling payments for the benefit of Mary A. Lamb. All payments or withdrawals from this account up to June 27, 1940, were made with the specific approval of Mary A. Lamb.

"We find that when the respondent on June 27, 1940, a few hours before the death of Mary Lamb, withdrew all that remained of this account, then amounting to more than Seven Thousand Dollars ($7,000.00) and redeposited the same in his sole name, that it was a violation of trust and was a conversion of said money to his own use.

"We further find that although withdrawn as aforesaid and deposited in the sole name of the respondent, the respondent was accountable to the estate of Mary A. Lamb for the same after her death."

The respondent excepts to the next to the last paragraph in the foregoing finding on the ground that this is a conclusion of law which is entirely unsupported by other facts found, and is unsupported by the evidence. The other facts found in this finding support the conclusion, and the exception is without merit.

Finding XI in the language of the presentment is as follows:

"The said Thomas F. Mangan on March 26, 1940, withdrew from the Marble Savings Bank account the sum of Eight Hundred Dollars ($800.00), which sum was deposited with the Rutland County National Bank in a checking deposit, for the purpose of drawing checks to pay the bills of Miss Lamb; and on May 8, 1940, the said Mangan withdrew a second sum of Eight Hundred Dollars ($800.00) and deposited the same in the Rutland County National

Bank, and for the same purposes, by reason of the fact, as claimed by the said Thomas F. Mangan, that the first sum of Eight Hundred Dollars ($800.00) was insufficient to pay the bills of Miss Lamb."

Finding XII is as follows:

"As to Paragraph 16 of the presentment, the respondent, in his answer makes general denial, but further states that certain of the payments alleged therein he deemed as payments to himself for compensation for services rendered. We find that from the Sixteen Hundred Dollars ($1600.00) which was withdrawn from the Marble Savings Bank in two payments of Eight Hundred Dollars ($800.00) each and redeposited in the name of the respondent in a checking account at the Rutland County National Bank, the respondent withdrew and converted to his own use the following sums upon the dates indicated and upon checks payable as indicated, viz.:

March 28, 1940, check to Thomas F. Mangan, $100.00;

Check No. 12, to Rita Mangan (sister of Thomas Mangan), 10.00;

April 25, 1940, No. 13, to Rutland Country Club, 60.50;

April 29, 1940, No. 24, Cash, 25.00;

May 3, 1940, No. 23, Spaulding Motor Co. 40.00;

May 11, 1940, No. 26, John W. Burke, Secretary Eagles Club, 8.00;

May 14, 1940, No. 27, Cash, 50.00;

May 23, Cash, 50.00;

June 10, 1940, Cash 50.00;

July 2, 1940, F. B. Howard & Co., 45.00;

July 8, 1940, Cash, 50.00;

July 9, 1940, Wally Frank & Co., Ltd. 3.40;

July 11, 1940, Spaulding Motor Co., 27.30;

July 18, 1940, James Murray, 61.50;

Proponent's 38, date not appearing, Cash, 25.00;

| August 3, 1940, Cash, | 50.00; |
| August 6, 1940, Vt. Mansfield Hotel Co., | 40.00; |
| August 19, 1940, Cash, | 35.00; |
| Sept. 4, 1940, Cash, | 101.11; |

"We find as to all of the foregoing withdrawals which were made before the death of Mary Lamb, that each was a conversion of money of Mary Lamb by the respondent to his own use.

"We find he made no charges against Mary Lamb upon his books; gave no credits to her upon said books, and never rendered an account to her during her lifetime.

"We find further that after the death of Mary Lamb he presented to the commissioners on her estate a claim for Twenty-five Hundred Dollars ($2500.00) for services.

"We find further that all of the money remaining on said account in the Rutland County National Bank after the death of Mary Lamb was a part of her estate, and that the several withdrawals above mentioned made after June 27, 1940, were conversions to his own use of the several sums mentioned."

The respondent excepts to the finding "wherein it is stated that the funds withdrawn from the Marble Savings Bank were converted to the use of the respondent," on the ground that such finding is a conclusion of law, which is entirely unsupported by other facts found and is entirely unsupported by the evidence. The funds found to be converted in this finding were those withdrawn from the Rutland County National Bank, not the Marble Savings Bank, but passing over this fault in the exception there is no merit in it. All of the foregoing checks, except the one entitled "Proponent's 38, date not appearing, Cash $25.00," are listed in the presentment, and the respondent in his answer says that Mary A. Lamb repeatedly expressed her desire that he be paid for his services, that she and he recognized his right to compensation, and that he paid himself the reasonable value of his services, out of the funds available for the payment of her general obligations, by

means of the checks for his benefit listed in the presentment. He testified at the will trial that he had the benefit of these checks, including proponent's 38. As to the checks written after Miss Lamb's death, the charge of conversion is supported by the finding, unexcepted to, that all of the money remaining in the account in the Rutland County National Bank after her death was a part of her estate. As the respondent admitted that he had the benefit of all the checks, the burden was upon him to show that he received them for services. *Gale* v. *Gale,* 70 Vt 540, 41 A 969. He was the only witness to this. The findings that the respondent made no charges against Miss Lamb on his books, and never rendered an account to her, and that after her death he presented a bill against her estate of $2500.00 for services, and, as appears in finding IX above quoted, that he had between $500.00 and $600.00 for his own use from the account in his name as trustee in the Rutland Trust Company, refute his claim that these checks were drawn in payment of services, and show that the commissioners disbelieved him, and taken together with finding XI above quoted, support the finding of conversion as to all the checks.

We quote from finding XIII:

"He" (the respondent) "was dealing with an old lady, weak physically and of doubtful mental capacity. Within a few days after he was first employed, this client, according to the respondent, was desiring to give to him, by will, a considerable estate, although only a few months earlier she had made a will giving the bulk of her estate to residuary legatees who were relatives. It is very apparent from the evidence and the sequence of events as unfolded from May 1939, to the date of the death of Mary Lamb, that the respondent was treating the property of Mary Lamb as soon to be his, and in various ways he proceeded to get it into his title and possession."

On the foregoing showing the conversions of money by the respondent were of such nature as to require that he be disbarred. Where a client intrusts money to his attorney to be used for a particular purpose, and the attorney converts it to his own

use, he is guilty of professional misconduct. *Re Newman,* 211 App Div 654, 208 N. Y. Supp. 140; *Bar Ass. of the City of Boston* v. *Casey,* 196 Mass 100, 81 NE 892; *In the Matter of Carver,* 224 Mass 169, 112 NE 877; *In re Hoffecker,* Del. Ch., 60 A 981. It is indispensable that an attorney be trustworthy, and he is not trustworthy if he is guilty of improperly applying to his own use his client's money. *In re Allen,* 75 NH 301, 73 A 804. For further cases see Annotation, 43 ALR 63.

Subsequent to the conclusion of the testimony before the commission, the attorney general amended his presentment by adding five additional charges, based as he claimed upon evidence that had already been received. These additional charges set out three certain alleged false answers which the respondent gave to questions propounded to him while a witness in the trial of the will case in county court, and one alleged false answer which he gave to a question in his deposition in perpetuam, all of which answers it is alleged he knew to be false. The fifth additional charge is too in-definite to merit consideration. The four specific charges seem off-hand to be supported by answers given by the respondent to questions asked him in his oral testimony before the commission during the last part of the hearing. The attorney general so asserts in his brief. When the commission later met for a hearing upon the additional charges neither side appeared, and it is not surprising that, in the absence of assistance of counsel in checking the voluminous transcripts of testimony introduced in evidence, and especially in view of the respondent's oral testimony, in which he admitted giving evasive answers in reply to questions asked in the will proceedings and in his deposition, the commission should have found the four specific charges to have been sustained. An additional opportunity to err in the finding that the respondent, in his deposition taken for the purpose of perpetuating his testimony, upon being inquired of as to his knowledge of the extent or amount of the property of Miss Lamb at the time of the execution of the will on May 13, 1939, testified that he had no idea of the amount of her property, and that this statement was false and known by him to be false, was afforded by what appears in the transcript of the evidence taken in probate court on September 7, 1940, Ex. 1-B, which shows the following questions to and answers by the respondent:

"Q. Did you learn at some time while you were drafting this will the amount of her property?
"A. No.
"Q. At the time this will was drawn and executed, did you learn from her the amount of property that she had?
"A. I had no idea of the amount of her property."

A careful examination of the. county court transcript and of the deposition in perpetuam fails to find any support for the four charges of false testimony as framed, and the exceptions thereto are sustained. This conclusion makes it unnecessary to consider the demurrer to the additional charges.

*Judgment that Thomas F. Mangan is removed from the office of attorney and counsellor at law and solicitor in chancery.*