### In re James Weston Wright

[310 A.2d 1]

No. 150-71

Present: Shangraw, C.J., Barney, Smith, Keyser and Daley, JJ.

Opinion Filed October 2, 1973

*Kimberly B. Cheney,* Attorney General, and *Michael K. Krell,* Assistant Attorney General, for Plaintiff.

*Richard E. Davis Associates,* Barre, for Defendant.

**Per Curiam.** This is a presentment brought by the Attorney General of the State against the respondent, James Weston Wright, charging him with eleven counts of unethical and unprofessional conduct in his office as an attorney of this Court. After the respondent answered the presentment, the Court appointed a committee of three prominent members of the Vermont Bar to hear the evidence and find the facts. The committee held hearings for over forty days during which four counts were dismissed on motion of the Attorney General. The respondent was represented by counsel and introduced evidence in his own behalf.

The committee completed their duties and filed its report and conclusions on February 8, 1973. Upon hearing the Attorney General and the respondent on their responses filed to the findings of the committee, the Court accepted the report of the committee subject to appropriate final review and disposition.

The respondent is a graduate of the University of Michigan, and its School of Law. He was admitted to the Michigan Bar in 1954 and to the Vermont Bar in 1962 after which he became a member of the Vermont Bar Association. He then engaged in the general practice of law in Woodstock, Vermont, and was State's Attorney for Windsor County from 1965 to 1969.

The inquiry into the matter presented is "in the nature of an investigation by the Court into the conduct of one of its own officers, not the trial of an action or suit. . . . The real question for determination in such proceedings is whether or not the attorney 'is a fit person to be longer allowed the privilege of being an attorney.'" *In re Haddad,* 106 Vt. 322, 325, 173 A. 103 (1934).

## Counts II and III

These counts involve the respondent with conflict-of-interest employment.

Respondent was attorney, director and clerk of Hawk Mountain Corporation (Hawk Mt.) and Sky Hawk Corporation (Sky Hawk), and owned a share of stock in each. Mt. Ascutney Ski Area, Inc. (Mt. Ascutney) and its president owned land in the ski area and in 1969 contracted with Hawk Mt. to construct houses on its lots numbers S-1, S-45 and S-54. Hawk Mt. assigned its rights to Sky Hawk after which Mt. Ascutney deeded it Lot S-1 and later Lots S-45 and S-54. In each instance Sky Hawk gave a mortgage to the First National Bank in Springfield, Vermont.

The respondent was present during the negotiations leading to the agreement between Mt. Ascutney and Hawk Mt. and drew the assignment from Hawk Mt. to Sky Hawk. Both deeds and mortgages covering the three lots were prepared in respondent's office and, if not dictated by him, were at least seen by him before they left his office. He forwarded these documents to the mortgagee bank with a covering letter. These instruments and letters clearly show respondent had full knowledge that title to Lots S-1, S-45 and S-54 was vested in Sky Hawk.

Sky Hawk contracted with one Percy L. Norton to construct the houses on the lots including the drilling of deep wells on Lots S-1 and S-54. Norton proceeded with the construction and engaged Dean Herrick Artesian Wells, Inc., to drill the wells. Norton became involved financially. He owed $2,899. for the well drilling and $13,500. for building materials supplied by Shiretown, Inc.

The president of the well company, Mr. Harris, consulted respondent and on his advice decided to have a mechanic's lien placed on the job. Wright did not then disclose to him his relationship with the Hawk corporations or that Sky Hawk owned the lots. Respondent drafted the mechanic's lien but described Lots S-1 and S-54 as the property of Mt. Ascutney. Sky Hawk was not notified of the lien pursuant to the statute.

Respondent then brought suit in county court against Norton naming "Sky Hawk at Pittsfield" as a defendant trustee which showed knowledge that Sky Hawk was involved. Wright

first received a check for $1,000. Later he received one for $1,899. upon receipt of which Wright discharged the mechanic's lien. The checks were sent to Harris but the payee bank refused payment on two occasions.

Upon learning of discharge of the lien, Harris discharged Wright and engaged other counsel. His new attorney negotiated with respondent for some period of time and finally obtained payment of the claim by Hawk Mt.'s check.

Wood, an officer of Shiretown, called Wright in June 1969, relative to its Norton account. He advised the use of a mechanic's lien. In July, Wood and Ueland conferred with Wright and were told he was free to represent the company. They saw Wright in early August and asked him what other steps they could take. He replied he wasn't sure who owned Lot S-1. Shiretown's detailed bills referred to the three numbered lots in question.

Wright brought suit September 4 against Norton in which Sky Hawk was named as a defendant trustee. Shortly after Wright prepared a mechanic's lien on Lot S-1 at Wood's direction and sent it to Wood with instructions. The premises were described in the lien as being owned by Mt. Ascutney. In his letter Wright stated that "circumstances could develop to create a conflict situation between the interest of Shiretown, Inc. and Sky Hawk Corporation. I had not originally thought so and Sky Hawk was of the same opinion, mainly since Sky Hawk is not the owner of the property and does not appear to be directly involved." He then suggested that they obtain separate counsel who would not be faced with this potential conflict.

After this Wood and his attorney discovered the recorded deeds and mortgages in the land records. Notice of mechanic's lien was promptly filed against the three lots reciting Sky Hawk as owner, and subsequently suit was brought against Sky Hawk. Respondent attempted to negotiate a settlement with Shiretown's attorney. Default judgment was entered and eventually payment was made by Sky Hawk's check transmitted through respondent's office.

The report of the committee, supported by the evidence, clearly demonstrates a definite conflict of interest posture in Counts II and III.

Here, respondent was immersed in the business of the Hawk Mt. and Sky Hawk corporations in a capacity more than just legal counsel. This intensifies the nature of his alleged misconduct. It is a basic concept that an attorney, of all men, cannot undertake the representation of conflicting interests or the discharge of inconsistent duties as revealed in this case. See *In re Themelis*, 117 Vt. 19, 22–23, 83 A.2d 507 (1951); *In re Wakefield*, 107 Vt. 180, 189, 177 A. 319 (1935).

It is patently clear that respondent knowingly and wilfully put himself in a position where he was undoubtedly representing conflicting interests. Furthermore, it is evident that he did this in such a manner that he undertook specific actions to benefit one client to the detriment of two other clients. This misconduct strikes at the very heart of the attorney-client relationship and cannot be excused or condoned in any way. Respondent has no basis to claim that his behavior is acceptable.

## Count IV

This count relates to a will drafted by the respondent for a Mrs. Dunlop S. Garceau, a widow, of Woodstock, Vermont. The will contained bequests benefiting members of the Wright family to the extent of more than $150,000. and named the respondent as executor.

The bequests gave Wright's wife 200 shares of common stock of Standard Oil of New Jersey outright; his mother received the decedent's house and contents; his wife, $50,000. as custodian for the respondent's two minor daughters; and his wife, again, as trustee of the Stockbridge Free Public Library, $35,000., not in trust but to be used in her sole discretion for library purposes. The complaint also alleges an improvident sale of some stock of the Woodstock National Bank by the executor to himself. This charge was not dealt with in the findings, since the stock has apparently (according to the answer of the respondent) been returned to the estate.

The State pursued the approach that the respondent achieved the bequested benefits by the exercise of improper and undue influence. The evidence revealed a woman who was recently bereaved suddenly discovering she was in the

grip of incurable cancer. She had met the respondent in connection with the handling of her husband's estate. As time passed she turned more and more to him for advice and support. She also came to use alcohol in significantly large amounts. At the time of her husband's death they had reciprocal wills, carefully drafted as to distribution, tax consequences, and charitable bequests. The 1963 will of Mrs. Garceau was destroyed by her and ultimately supplanted by a will drafted by the respondent with the previously described bequests contained in it.

The committee did not find Mrs. Garceau incompetent, or that because of alcoholism or for any other reason respondent had exercised undue influence over her, although it did comment that had the will been challenged on that ground, the state of facts revealed might have put the burden on the respondent to refute an inference of undue influence.

The condemnation of the committee is based on respondent's failure to more strongly insist that the favorable bequests be drafted by another attorney, and that she seek independent advice before carrying out these bequests as provisions in her will. The committee rests its condemnation on what it finds is the "better practice" prevailing in that part of Windsor County.

The respondent points out that what was done was not, at that time, a specific breach of the American Bar Association Code of Ethics, and that the testimony of Windsor County attorneys did not support the "better practice" referred to by the committee.

Reviewing the matter and viewing it as a single episode, this episode does not seem to be a basis for more than a warning from this Court, since none of the principals in the estate have made any complaint. However, since this episode does not stand alone, it is a fact which this Court must consider together with all the other established acts and conduct of the respondent encompassed within the complaint.

## Count V

This count of the complaint relates to another testamentary instrument prepared by the respondent. The testatrix

was Florence B. Bigelow of Royalton, now deceased. Mrs. Bigelow suffered from cataracts and had great difficulty seeing, eventually becoming totally blind. She consulted with the respondent respecting the preparation of her will. Such a document was eventually prepared by him.

At some time after its execution, Mrs. Bigelow had the will read to her by a third party. It contained a bequest to respondent's wife, not in trust, of 25 shares of I.B.M. stock, to be used as she saw fit for library purposes including the Stockbridge Free Public Library. It also left one-quarter of the residue of her estate to the respondent and appointed him executor, to serve with nominal bond. When these provisions were read to her, Mrs. Bigelow disavowed any intention or desire to make such arrangements and went to another attorney to draw a new will, which was done. Her estate amounted to something more than $200,000.

Since the questioned will never became operative, and Mrs. Bigelow died before these proceedings were held, the committee was not confronted by disappointed heirs, nor could it entirely resolve issues relating to Mrs. Bigelow's memory, knowledge or understanding of her directions to the respondent. The findings reflect some inconsistencies in respondent's testimony, but the committee confined itself to condemning respondent's poor legal advice with respect to attempted charitable bequests and the impropriety of including bequests to himself and family without referring the client to outside independent legal advice. This is essentially the same condemnation as appears in Count IV.

The respondent contends, first, that contrary to the testimony of others, he not only fully carried out Mrs. Bigelow's wishes, but that she fully understood and agreed with all that was done. Second, he again asserts that there was no breach of any Code of Ethics as then published.

The difficulty with the respondent's defense is that, although it might be available for any single instance of this kind of activity, that is not the situation that confronts this Court. The findings of both Counts IV and V have evidentiary support, and it seems clear the committee has, in its conclusions, limited itself to conduct it found improper that was most fully evidenced. Whether there was a violation of the Canons of Professional Ethics by the respondent, in either

Count IV or V, which he denies, the appropriateness of his conduct exemplified in these counts nevertheless demonstrates an unwholesome standard of professional conduct.

## Count VII

This count has reference to the sale of real estate by the respondent as administrator cta dbn of Fred G. Ullrich Estate to Robert Cotner, respondent's father-in-law, and also his conduct on October 14, 1966, toward Mrs. Beatrice A. Milnor in order to obtain a quitclaim deed to his father-in-law of her interest in the Ullrich farm.

The facts alleged in the complaint are sufficient to adequately inform the respondent of the state's claim of misconduct under this count.

On October 9, 1964, Fred G. Ullrich and Beatrice Ullrich of Somerville, New Jersey, acquired title to a farm in the Town of Barnard "as tenants by the entirety, to the survivor of them, and to the survivor's heirs and assigns" at a cost of $35,000. At that time a bank mortgage was placed on the farm.

Mr. Ullrich lived in New Jersey and hired a tenant to operate the farm for him. He died testate on May 16, 1966. His stepson, William Anderson, was executor of the estate in New Jersey and had the respondent appointed administrator cta dbn of the estate in Vermont.

When the deed to the farm was found soon after Mr. Ullrich's death, it became known that Beatrice Ullrich named in the deed was in fact Beatrice A. Milnor, the parties never having married.

The inventory of the Vermont estate dated September 16, 1966, and sworn to by the respondent stated the value of the farm was $35,000. and listed an undivided one-half interest of the estate at $17,500.

Confirming a prior oral agreement, the respondent as administrator of the Ullrich estate on September 16, 1966, entered into a written sales-purchase agreement with respondent's father-in-law whereby the latter would purchase the interest of the said estate in the Ullrich farm at a price of $17,500. A deposit of $1,000. was made. The sale was contingent upon the issuance by the probate court to the

respondent as administrator of a license to sell real estate and the acquisition of the interest of Beatrice Milnor by Cotner. No real estate broker was involved in the transaction. Neither were any bids sought or other efforts made to obtain the best price possible for the estate.

The respondent went to New Jersey on October 14, 1966, to see Mrs. Milnor. He had the estate file with him and also a deed prepared in his office for execution by Mrs. Milnor. If executed, it would convey her interest in the real estate to respondent's father-in-law.

At this visit Wright emphasized that Anderson was threatening litigation, that Anderson did not feel that Mrs. Milnor had any interest in the property, didn't want any part of the farm with her, and so she would have to undertake litigation in Vermont to prove that she owned either one-half of the property, or all of it. Wright took advantage of the fact that the affairs of the estate were muddled by showing her all of the bills and claims against the estate when her liability thereon was nil. He failed to reveal the true value of her undivided one-half interest in the real estate. On the basis of a valuation of $35,000. and a mortgage of $14,200. her interest had a computed value of $10,400. She was also told that Anderson was taking this into court and that it would be a very messy affair. For obvious reasons she didn't want any part of the court and her decision to convey was primarily to avoid litigation regarding her interest in the farm.

It is apparent that Wright as administrator used his efforts in such a way that his father-in-law, a creditor of his and a part-time member of his household, could obtain the Ullrich farm for a relatively small cash outlay, which was not for the benefit of the estate. In dealing with Mrs. Milnor, Wright was acting for his father-in-law.

The respondent was not issued a license to sell the real estate of the Ullrich estate until November 14, 1966. On the same date he deeded the interest of the estate in the farm property to his father-in-law for $17,500. He paid $3,000. cash to Mrs. Milnor, approximately $3300. to the estate, and assumed a mortgage for $14,200. which made his cash outlay for the purchase of the Ullrich farm approximately $6300., and a total cost to him of $20,500. for the farm.

As bearing on the value of the farm, it appears in evidence that the Ullrich farm was sold shortly thereafter for the sum of $45,000. through the local agent of the Strout Agency. The purchaser paid $40,500. to "James Wright Atty" by his check dated January 18, 1967. The difference of $4,500. had been paid to the Strout Realty agent in October 1966.

The committee found that "After agreeing to sell the estate's share to his father-in-law, Mr. Cotner, in early September 1966, Wright was more concerned with obtaining the property for his father-in-law at a low price than he was in obtaining the highest possible price for the estate's interest, if any, in the farm" and further that "Wright's sale to Cotner was a clear breach of fiduciary duty to the estate he was administering." A lawyer has a burden of responsibility that is uncommon to the ordinary citizen and his duty does not begin or end with the attorney-client relationship, but, as here, embraces duties as a fiduciary.

The committee's conclusion states that the respondent "obtained Mrs. Milnor's signature to a quitclaim deed for $3,000. through misinformation and exaggerated threat of litigation." The record supports this conclusion. This conduct constituted unprofessional, unconscionable and unethical conduct bordering on misrepresentation and fraud on the part of the respondent.

## Count VIII

This finding has to do with the respondent's handling of the Shirley Pierce Estate. The conclusionary findings of the committee were that Wright used his office as executor of the estate, at least in respect to the handling of the real estate, for the benefit of members of his family, rather than the beneficiaries of the estate.

The respondent sold property known as the Dickens place, appraised at $6,000. to Robert Cotner, his father-in-law, for $5,000. Respondent could offer no proof that such money was ever received by the estate from Cotner. It was later sold by Cotner to a Mr. and Mrs. Spaulding, through Wright, for $12,000., and the check for such purchase was made out to Wright. Wright offered no proof that the profit in the sale was ever paid to his father-in-law, now deceased. The re-

spondent failed to establish that the transaction was bona fide. The respondent rented deceased's homestead, the lower part of the so-called Golf Hill property, to his parents. Later he sold this property to a client and business associate, Mid-State Loans, for $6,000. which was only 50% of the amount it was appraised for by the estate appraiser. The purchaser continued to rent the premises to the parents of the respondent as long as his father was alive. Neither property was placed on the open market for sale.

The findings of the committee are amply supported by the evidence in this count, and the conclusionary findings are adequately supported by both the findings and the evidence.

## Count IX

Robert J. Daniels and wife acquired a farm in Tunbridge, Vermont, in 1962, and executed a mortgage to their grantor for $3,200. The mortgage was assigned on May 4, 1964, to respondent's father-in-law, Mr. Cotner. Payments on the mortgage were in arrears and Wright wrote the Daniels threatening foreclosure.

Respondent prepared a deed for execution by the Daniels to himself and Mr. Cotner and an instrument entitled "Lease Indenture with Option to Purchase" from himself to the Daniels, both covering their farm property. These papers were executed on May 27, 1964, at the office of Mrs. Kratky in South Royalton but Mr. Cotner did not sign the lease. The Daniels thought only that the mortgage was being renegotiated.

Difficulties arose concerning the payments due and Mrs. Daniels retained attorney Angell of Randolph to obtain a settlement of the indebtedness. On April 19, 1967, Mr. Angell notified respondent of this fact by letter and stated that the Daniels were able to pay the full amount due. He asked for an account from Wright showing the amount of the indebtedness. Respondent failed to reply and four months later Angell requested a reply.

Respondent replied in March 1968, that the lease agreement was breached, that the Daniels had no interest in the property, were being asked to vacate claiming their tenancy was one at will. That same day he wrote a letter to the Daniels

threatening legal action to force them off their property and soliciting them to contact him directly and not through their attorney. Wright did not furnish attorney Angell with a copy of this letter.

About April 15, 1968, Mrs. Daniels met with respondent and Mrs. Kratky at her Mid-State Loan office. Both of the parties knew Mr. Angell was attorney for the Daniels. Mrs. Kratky solicited Mrs. Daniels to come to the meeting and settle matters and urged her to disregard the services of her attorney. Respondent made no attempt to contact Mr. Angell about the meeting and no permission had been given by Mr. Angell for Wright to talk with the Daniels.

██ ██ The actions of the respondent as to the Daniels obviously ran contra to the Canons of Professional Ethics of the American Bar Association. The letter written to the Daniels in March, 1968, constituted a violation of Canon 9, and the letter he wrote to attorney Angell the same day containing statements which he knew, or as a lawyer should have known, to be false was a further and more serious violation of Canon 22.

This Court has previously compared the conduct of a practicing attorney to the standard set forth in the Canons of Professional Ethics as a guide in determining whether or not that attorney was guilty of professional misconduct. See *In re Themelis,* 117 Vt. 19, 22, 83 A.2d 507 (1951) ; *In re Wakefield,* 107 Vt. 180, 189, 177 A. 319 (1935). Therefore, the conclusions of the committee that the respondent's conduct was clearly unethical is established by the record. Although the proper penalty to be imposed must be determined by examining this count in relation to the preceding counts, the conduct of the respondent clearly failed to meet the standards required of a practicing attorney of this Court.

We shall next consider the points of error raised by the respondent in his brief. At the outset he argues that the complaint did not specifically set forth the findings and conclusions made by the committee. The respondent also maintains that the complaint was not sufficient to adequately inform him of the charges against him.

██ ██ A complaint in disbarment proceedings is sufficient if it fairly informs him of the nature of the misconduct

of which he is accused. 7 C.J.S. *Attorney and Client* § 31, at 776. It shall consist of a plain statement which will give the respondent due and proper notice of the basis of the petition for his disbarment. *In re Krehel,* 419 Pa. 86, 213 A.2d 375, 378 (1965).

The complaint clearly sets forth the factual matters that were the subjects of the evidence presented to the committee upon which it concluded professional misconduct on the part of the respondent warranting disbarment. The findings and conclusions of which the respondent complains all relate to the factual matters in the complaint and present a clearer background of events upon which the committee made an investigation of the factual matters in the complaint to determine the existence of professional misconduct on the part of the respondent. The respondent takes nothing on these claims of error.

The respondent maintains that the committee did not permit him to introduce character evidence as to his reputation for honesty and fair dealing. The permissible scope of character evidence was set forth in *In re Monaghan,* 126 Vt. 53, 62, 222 A.2d 665 (1966):

> "By a rule which is almost universal (in the United States at least) the personal knowledge and belief of the witness to character is rigorously excluded, and the community reputation is all that will be listened to."

The committee clearly and correctly defined the perimeters in which the respondent could introduce character evidence:

> "[W]e are going to limit it to lawyers talking about reputation for truth and veracity in the legal community and that legal community can be the entire State of Vermont."

The respondent made no attempt to introduce any witness within the proper perimeters set by the committee.

The ruling of the committee was correct in law; hence, no error is shown by the respondent.

The respondent argues generally and specifically against several counts in the complaint on the theory of laches, in that the incidents upon which the counts are based occurred

several years before the complaint was made by the attorney general. Laches is not a mere matter of time. *Page* v. *Cave,* 94 Vt. 306, 309, 111 A. 398 (1920). Prejudice must result from the delay that works to the disadvantage and prejudice against the one who claims it. *Laird Properties* v. *Mad River Corporation,* 131 Vt. 268, 305 A.2d 562, 570 (1973). The respondent neither raised the issue of laches before the committee nor has he made any showing that he was prejudiced or disadvantaged in presenting a defense to the matters alleged in the complaint.

The respondent also complains that the time has expired for appeal or making any complaints or charges in connection with his handling of the estates in Counts VII and VIII. Such is not the general issue, only a question of fact upon which a conclusion had to be made on the respondent's professional conduct. Although a statute of limitations bars actions at law, it is not a defense nor is it applicable to disciplinary proceedings. *Wilhelm's Case,* 269 Pa. 416, 112 A. 560, 561 (1921).

The respondent also argues as to the proper burden of proof in disciplinary proceedings. However, the rule in this jurisdiction is quite clear. "In order to justify disbarment, the case must be clear and free from doubt." *In re Haddad,* 106 Vt. 322, 326, 173 A. 103 (1934). This Court has never regarded disciplinary proceedings as criminal in nature. See *In re O'Brien,* 95 Vt. 167, 179, 113 A. 527 (1921). See also, e.g., *In re Moore,* 127 Vt. 549, 254 A.2d 589 (1969); *In re Reiter,* 127 Vt. 98, 241 A.2d 66 (1968). As such, the committee is not required to satisfy itself of guilt beyond any reasonable doubt; a preponderance of evidence is sufficient as long as the case is clear and free from doubt. This burden has been more than sufficiently met, and where a *prima facie* case is made out, the burden of proof is then on the attorney to justify his conduct. 7 C.J.S. *Attorney and Client* § 33, at 781. See also *Re Mangan,* 113 Vt. 246, 256, 32 A.2d 673 (1943).

The respondent also makes exhaustive challenges to the findings of the committee urging that the weight of the evidence requires that certain findings be modified

or deleted. However, contrary to the respondent's contention that this Court is to review the evidence *de novo* in disciplinary proceedings, the committee was the trier of fact in these proceedings; and as such it was for the committee to determine the weight of the evidence and the persuasive effect of the testimony. 7 C.J.S. *Attorney and Client* § 37, at 805; *Armstrong* v. *Hanover Insurance Company*, 130 Vt. 182, 185, 289 A.2d 669 (1972). We find that the findings are clearly and reasonably supported by the evidence and must stand. *Armstrong* v. *Hanover Insurance Company*, *supra*. Furthermore, it is clearly beyond the province of this Court to make other or additional findings as requested by the respondent. *Partridge* v. *Cole*, 98 Vt. 373, 376, 127 A. 653 (1925).

The respondent alleges hearsay evidence was admitted on numerous instances before the committee and goes on to state that the instances are too numerous to brief. This Court is not required nor about to undertake a search for claimed error where it is not adequately briefed, supported by argument, or pointed out in the record before us. *Roberts* v. *Gray*, 119 Vt. 153, 159, 122 A.2d 855 (1956); *Johnson* v. *Moore*, 109 Vt. 282, 288, 196 A. 246 (1938). Moreover, the respondent has not shown that hearsay evidence was a material factor in any of the findings and conclusions of the committee. Absent such showing, the respondent's claim of error is without merit. *East Montpelier Development Corporation* v. *Barre Trust Company*, 127 Vt. 491, 494, 253 A.2d 131 (1969).

The respondent also raises the specter of "private spite" being the basis of the complaint brought against him. However, the complaint was brought from the office of the Attorney General of this State, not by private individuals. For the respondent to make such an allegation without presenting a factual argument to support such claim as against other members of the Bar of this State, but only as against individual witnesses who were, in several instances, the victims of his professional misconduct says enough of this claim of error without further comment by this Court.

The respondent next argues as to Counts VII and VIII that he committed no breach of fiduciary trust, and even if he had,

it does not follow that he was guilty of professional misconduct.

The complaint as to these Counts alleged that the respondent, as administrator of one estate and executor of another, placed values on properties in those estates far below the selling price of those same properties in conveyances taking place shortly after the distribution of those estates. The committee found that the respondent was involved either directly or indirectly in those later conveyances which worked to the benefit of others, including relatives, rather than to the beneficiaries of the estates.

The administrator or executor of an estate has the duties of collecting the assets of the estate, pay its debts, and distribute the residue to the beneficiaries of the estate. *Baldwin* v. *Taplin*, 113 Vt. 291, 295, 34 A.2d 117 (1943). He is held to the utmost frankness and fair-dealing in his relations with the beneficiaries of the estate. *In Re Walker's Estate*, 100 Vt. 366, 370, 137 A. 321 (1927). By this standard, the respondent was placed in a fiduciary relationship as to the. beneficiaries of both estates. See 36A C.J.S. *Fiduciary*, at 381, 385.

The findings of the committee show a clear design to place interests of others above the interests of the beneficiaries of the estates by the respondent. Therefore, the conclusions of the committee that the respondent breached his fiduciary trust is correct in law.

In *Re Mangan*, 113 Vt. 246, 256–57, 32 A.2d 673 (1943), this Court held—"Where a client intrusts money to his attorney to be used for a particular purpose, and the attorney converts it to his own use, he is guilty of professional misconduct." See also *In re Milne*, 126 Vt. 69, 222 A.2d 360 (1966). The properties in the estate were entrusted to the respondent in his capacity as executor and administrator for the particular benefit of the beneficiaries of those estates. The findings of the committee, amply supported by the evidence, display a design on the part of the respondent to manipulate the conveyances of these properties so that the greater ultimate benefit from those conveyances would fall to others, including relatives, rather than to the beneficiaries of the

estates. Although he did not convert the proceeds of these series of transactions to his own use, the set of findings presented by the committee demand no less condemnation than if he would have personally profited from these transactions.

The respondent also argues against holding him responsible for a breach of fiduciary trust to Mrs. Milnor in Count VII. The committee based a finding of professional misconduct on the part of the respondent in his dealings with Mrs. Milnor on the devices he used to obtain her signature on the quitclaim deed. The respondent takes nothing on these claims of error.

The respondent also claims that the sale of the properties complained of in Counts VII and VIII was ratified or consented to by the beneficiaries of the estates, thus estopping any attack on those transactions by him as administrator and executor of those estates. However, for there to be ratification, it must appear that the one ratifying has knowledge of the material facts and the acts that he is supposedly adopting as his own. *Templeton Construction Corporation* v. *Kelly*, 130 Vt. 420, 425, 296 A.2d 242 (1972). The professional misconduct found by the committee consisted of not only the sale of the properties, but also the network of transactions created by the respondent through which the properties passed in order to benefit members of his family, among others.

It is apparent from the findings that these activities were not readily apparent to the passing eye, if not purposely concealed. The respondent has not shown, nor can it be presumed, that the beneficiaries had any knowledge of the dealing of the respondent beyond the simple sale of the properties in collecting the assets of the estates, nor that they would have, if they knew, consented to the greater benefits from the sale of those properties going to others rather then themselves. The respondent presents nothing to sustain a claim of ratification that would negate the conclusion of professional misconduct made by the committee.

The respondent argues both generally and to specific Counts that there has been no showing of improper mo-

tive or intent in the actions in which he has been accused of professional misconduct. However, bearing in mind Counts IV, V, VII and VIII, with the overtones of Counts II, III and IX, the considerations of excusable ignorance, inadvertence or innocence disappear. This respondent has been an admitted attorney since 1954, and a member of the Vermont Bar since 1962, so that the excuse of inexperience is hardly available. With the consistent pattern of benefits to himself and family emerging from a series of several transactions, it seems clear that what might be in a single instance only poor judgment *sans* evil intent or direct motive becomes a condemnable course of conduct amounting to ethical unfitness for clients' trust. In some ways, an attorney who deliberately and skillfully operates consistently at the very verge of ethical limits to his own benefit is more to be condemned than the attorney who, on a single occasion, under pressure, definitely breaks through ethical bounds. It is the first man that the public abhors, distrusts and condemns with good reason.

Therefore, in light of the findings and conclusions of the committee on all counts, this Court is no longer able to hold the respondent out to the community, by allowing him to practice law in the courts of the State, to be a man worthy of confidence to whom all could safely confide and entrust their rights to property, liberty and life. *Re Enright*, 67 Vt. 351, 354, 31 A. 786 (1895). The record presented to the Court requires that the respondent be disbarred.

*Judgment that James Weston Wright is removed from the office of attorney and counsellor at law and solicitor in chancery and his name is striken from the rolls.*