## In re Alan D. Rosenfeld

[601 A.2d 972]

No. 89-513

Present: **Allen, C.J., Gibson and Dooley, JJ.**

Opinion Filed November 1, 1991

Motion to Stay Until December 2, 1991, Granted November 6, 1991

Motion to Stay Until December 16, 1991, Granted November 27, 1991

Motion for Reargument Denied November 27, 1991

Motion for Further Stay Denied December 6, 1991

*Jeffrey L. Amestoy*, Attorney General, and *Marilyn Skoglund*, Assistant Attorney General, Montpelier, for State.

*William A. Hunter*, Ludlow, for Respondent.

*J. Eric Anderson*, Manchester Center, for amicus curiae Professional Conduct Board.

**Per Curiam.** The Attorney General brought a nine-count presentment in this Court against attorney Alan Rosenfeld, alleging that he violated the Code of Professional Responsibility. The alleged violations were in connection with three civil cases in which he represented a party in litigation, and a case in which he was a pro se plaintiff. We referred this matter to a committee for fact-finding, legal conclusions and recommended action. See Permanent Rules Governing Establishment of Professional Conduct Board and its Operation, Administrative Order 9, § 18(d).[1] The committee consisted of Ritchie E. Berger, Esq., chairman, Patricia A. Barr, Esq., and William J. Donahue, Esq. Evidence was taken over three days in November 1990, and on December 13, 1990, the committee issued findings and conclusions: It concluded that three of the counts had been proven by clear and convincing evidence. On one of the counts, a majority of the committee found that it had not been proven by clear and convincing evidence, and Chairman Berger dissented. The Attorney General withdrew one of the counts, and the committee concluded unanimously that the remainder had not been proven. The committee held a separate sanction hearing on December 14, 1990, and on December 20, 1990, filed a recommendation that respondent be publicly censured, that he be required to complete at least twenty hours of continuing legal education (ten in ethics, ten in office management) over an eighteen-month period, and that he be required to take a multistate professional responsibility examination and remain licensed to practice only if he passed it.

## I.

The Attorney General appeals the committee's failure to find a breach of the Code of Professional Responsibility in Count II(A) of the presentment, the matter on which there was not a

---

[1] Administrative Order 9 was totally rewritten effective July 1, 1989. The order provided, however, that "any matter then pending with respect to which a formal hearing has been commenced shall be concluded under the procedure existing prior to July 1, 1989." Since a formal hearing in this matter was held before the Professional Conduct Board prior to July 1, 1989, it is governed by the earlier rules. Thus, all references to A.O. 9 in this opinion are to the Administrative Order as it existed prior to July 1, 1989, except as otherwise indicated.

unanimous opinion. The Attorney General further urges that we not accept the recommended sanction and instead suspend respondent from the practice of law for an appropriate period.

In order to address the sanction issue, we include a complete statement of the relevant facts bearing on the counts for which the committee found violations of the Code, as well as the count in dispute.

## II.

### COUNTS II(B) & (C)

These related counts arise out of respondent's representation of Katrina Yurenka in *Sacks v. Yurenka*, a parentage case, in which custody and visitation were contested. Respondent was retained in May of 1987 with a $500 retainer and an agreed rate of compensation of $50 per hour. Shortly thereafter, the rate was reduced to $25 per hour because of Ms. Yurenka's financial difficulties. There was no discussion of whether the client was to receive a detailed, itemized bill from respondent, although the committee found that an attorney practicing in Vermont should "maintain records adequate so that, upon request, a client may promptly be provided with a detailed, itemized bill for legal services provided."

Respondent's record-keeping did not allow him to present an itemized bill. On August 7, 1987, respondent billed Ms. Yurenka for legal services rendered without detailing those services. She paid him in October. In December, Ms. Yurenka hired another lawyer who asked respondent to notify the court of his withdrawal and send her Ms. Yurenka's file. Respondent sought confirmation from Ms. Yurenka that she was discharging him and wanted him to withdraw, but added that he would withdraw by the end of December if he did not hear from her. The client responded without addressing respondent's inquiry. She requested an itemized bill of the services he had rendered. At the end of January, 1988, respondent withdrew from the court action. In February, he wrote the client's new lawyer that he wanted to resolve any questions over his fee, adding:

> I will be able to prepare a specific accounting for Ms. Yurenka of *all* my work for her. To my mind, however, this will be a substantial change in the agreement that we had. I

can assure you that I spent substantially more time on the case than I have been paid for, and if requested to prepare a complete accounting I will do so and then expect payment for whatever balance it turns out remains unpaid. As a rough estimate, I had told Ms. Yurenka that the unbilled portion would be about thirty three percent extra.

The new lawyer responded that she found respondent's threat to increase his bill to be inappropriate and again sought Ms. Yurenka's file. Respondent began transmitting the file on March 25, 1988.

The committee found that respondent violated the Code of Professional Responsibility in two respects in connection with the Yurenka case.[2] It concluded that respondent's threat to increase his bill if he was required to create an itemized statement was "conduct that adversely reflects on [respondent's] fitness to practice law" in violation of DR 1-102(A)(7). It concluded that the delay in forwarding Ms. Yurenka's file to the new lawyer was "excessive and unjustified" and was also a violation of DR 1-102(A)(7) and of DR 2-110(A)(2) (a withdrawing lawyer must take "reasonable steps to avoid foreseeable prejudice to the rights of [the] client," including "delivering to the client all papers and property to which the client is entitled").

## III.

### COUNT II(A)

This count, on which the committee divided, also arose out of respondent's representation of Katrina Yurenka. In June 1987, the Washington Superior Court issued a temporary order giving temporary custody of the child to Ms. Yurenka, but awarded the father visitation each weekend and set the final hearing for July 14, 1987. On July 7, 1987, Ms. Yurenka became concerned that the father had sexually abused the child. She went to the Washington Superior Court seeking a relief-from-abuse order to prevent further contact between the child and the father. By

---

[2] The Attorney General did not allege misconduct in connection with respondent's delay in withdrawing from the court action. The committee concluded that respondent should have acted with greater dispatch but found no prejudice to the client and no unprofessional conduct.

chance, she met respondent at the court, and he helped her prepare the proper paperwork.

The relief-from-abuse petition was filed on July 10th, and the attorney for the father of the child was notified of the filing. The court decided to consolidate it with the hearing on permanent custody to be held on the following Tuesday, July 14, 1987. On learning that the matter would not be heard until after the weekend, respondent and Ms. Yurenka conferred on what to do about the father's right to visitation over the weekend.

Respondent told Ms. Yurenka that he could not advise her to violate the outstanding visitation order. Nevertheless, he told her that he did not think the judge would hold it against her if she denied visitation. He informed her "that it was his guess that . . . [the judge] did not expect her to permit . . . [the father] to exercise his parent-child contact for the coming weekend." To avoid a confrontation, he advised her not to be at home if she decided to withhold visitation. Respondent thought that his client would not allow visitation that weekend, and his expectation proved correct.

The majority of the committee found that respondent was properly sympathetic to his client's concerns and was honest with her. It noted that he failed to discourage her from violating the order, adding "his failure . . . was not blunted by his self-serving disclaimer that he could not counsel a violation of the order." The committee concluded that respondent did not violate DR 7-106(A) (a lawyer shall not advise a client to disregard a ruling of a tribunal made in the course of a proceeding, but may take steps in good faith to challenge the validity of the ruling) because of the jeopardy his client perceived in granting visitation, the inability to place the matter before the court prior to the weekend visit, the loss of only one weekend visit, and the short time prior to the court hearing. The committee also concluded that similar situations arose often in family practice and many attorneys "choose to assure the safety of the child over the sanctity of the court order."

The chairman of the committee dissented, concluding that the failure of respondent to advise Ms. Yurenka that she was legally obligated to comply with the court order effectively guaranteed that she would violate the order. He rejected the application of a different standard for family law practitioners

and concluded the conduct violated DR 7-106(A) as well as DR 1-102(A)(5) and (A)(7).

■■ The Attorney General argues that the committee's conclusion is inconsistent with its findings and should be reversed. Respondent urges that we uphold the conclusion on the basis that the evidence shows he did not "advise" his client to disregard the court's order. See DR 7-106(A). We first emphasize the proper standard for our review. The committee was the trier of fact and "it was for the committee to determine the weight of the evidence and the persuasive effect of the testimony." *In re Wright*, 131 Vt. 473, 490, 310 A.2d 1, 10 (1973). The committee's findings must be upheld if they are "clearly and reasonably supported by the evidence." *Id.*

The committee had to decide as a factual matter whether respondent advised Ms. Yurenka to violate the visitation order of the court. Often this determination is difficult because the precise words used may not reflect fully the message conveyed. As the Supreme Court of New Jersey found in a case where a lawyer told a client how he could skip bail:

> To the extent that respondent did not intend his remarks to constitute advice to a client, it nevertheless had all of the indicia of improper counselling. His communication is one that reasonably could be understood to convey improper advice.

*In re Mintz*, 101 N.J. 527, 535, 503 A.2d 290, 295 (1986). See also *Committee on Professional Ethics v. Crary*, 245 N.W.2d 298, 307 (Iowa 1976) (respondent's participation in successful effort to frustrate a custody order is circumstantial evidence that he counseled the client to disobey the order).

We read the findings of the majority of the committee as resolving the fact question against respondent. The committee did not adopt the theory that respondent technically complied with DR 7-106(A) because he did not advise the client to violate the order. Indeed, this theory was specifically rejected with a finding that respondent's failure "was not blunted by his self-serving disclaimer that he could not counsel a violation of the order." It is inconsistent with the committee's conclusions that respondent expected Ms. Yurenka to violate the visitation order and counseled her to be away from her house if she violated the order.

■ We are left, then, with the committee's conclusion that respondent's conduct was justified by the danger present to the child, the short duration of the violation, and the inability to obtain other relief. While we agree that these factors should mitigate any sanction imposed, we see nothing in the Code of Professional Responsibility that permits respondent's conduct. See *In re Goodrich*, 111 Vt. 156, 159–60, 11 A.2d 325, 326 (1940) (ignorance of ethical requirements does not excuse misconduct but operates to mitigate its seriousness). All of the facts here presented had been placed before the superior court in Ms. Yurenka's request for relief from abuse, and that court refused to act to change the outstanding custody and visitation order to suspend the father's visitation until the hearing on the permanent order. Respondent's obligation was to "trust in the efficacy of the legal system" to resolve the custody and visitation dispute, and counsel the client accordingly. *Florida Bar v. Wishart*, 543 So. 2d 1250, 1252–53 (Fla. 1989), *cert. denied*, 493 U.S. 1044 (1990). We do not agree that this obligation is different for attorneys handling family matters. See A. Haralambie, Handling Child Custody Cases § 9.23, at 135 (1983) ("Clients should always be counseled to work within the proper legal procedures in obtaining custody and visitation, without resorting to self-help."). Indeed, the need is greater in family matters where the emotional commitment of the parties to the rightness and justice of their cause may lead to the use of self-help, which undercuts the ability of the courts to resolve disputes in a meaningful or effective manner.

■ Based on the committee's findings of fact, we conclude that the Attorney General demonstrated ethical misconduct as alleged in Count II(A) of the presentment. We find that in connection with his representation of Ms. Yurenka, respondent violated DR 7-106(A), his conduct was prejudicial to the administration of justice in violation of DR 1-102(A)(5), and adversely reflected on his fitness to practice in violation of DR 1-102(A)(7).

## IV.

### *COUNT IV(A)*

This count arises out of respondent's representation of Ann Marie Limoge in *Lawrence v. Limoge*, also a child custody dis-

pute. Doctor Pamela Langelier was appointed as an independent expert in that case, and she testified in October 1987. Based on her testimony, the court awarded temporary custody of Ms. Limoge's daughter to the father, David Lawrence. When respondent entered the case in November 1987, he reviewed Dr. Langelier's testimony and consulted his own expert witness. After concluding that Dr. Langelier's evaluation was erroneous, respondent wrote her on December 21, 1987, conveying his conclusion, seeking to provide her with more facts, and stating:

> If you would be willing to spend up to an hour in your office discussing the case and reviewing the new information with me, I could offer to you a signed promise by Ann Marie Limoge not to hold you or the institute liable in any way for any damages caused by your mistake. (This waiver would only be effective if you retracted your previous testimony in writing prior to any court hearing which ultimately results in the return to Ann Marie of custody of [her daughter].)

At the time that he sent the letter, respondent had not obtained the authorization of his client to offer a waiver. Dr. Langelier responded that she felt threatened by respondent's letter.

While the committee questioned whether respondent had any good-faith basis to assert potential civil liability against Dr. Langelier, it did not find an independent ground for misconduct in respondent's motive. However, the committee found that sending the letter did violate DR 1-102(A)(5) and (A)(7) because it constituted conduct prejudicial to the administration of justice and reflected adversely on respondent's fitness to practice. The committee also found that the letter violated DR 7-109(C) because it offered payment to a witness "contingent upon the content of [her] testimony or the outcome of the case." It found that in acting without his client's authorization, respondent also violated DR 1-102(A)(4) (conduct involving "dishonesty, fraud, deceit, or misrepresentation") and DR 1-102(A)(7).

## V.

### SANCTION

The committee took evidence on the sanction to be imposed. Although it found that "[t]he record speaks of poor business

practice and poor judgment by respondent that raise serious concern as to the potential for repetition," it recommended that respondent not be suspended from practicing because he handles difficult and unpopular cases with passion and zeal, his testimony before the committee was frank and forthright, he was relatively inexperienced when the misconduct occurred and he was experiencing personal difficulties at the time. The committee recommended that respondent be required to take special CLE courses and be publicly censured.

In addition to the committee's recommendation, we consider the effect of the misconduct proved in Count II(A) of the presentment, and the fact that in May of 1988 this Court publicly censured respondent for misconduct. We based that censure on respondent having misled opposing counsel in a divorce case so that his client could obtain physical custody of the child of the parties. Respondent's conduct was found to involve "deceit and misrepresentation."

The Professional Conduct Board in an amicus brief has urged us to consider the American Bar Association Standards for Imposing Lawyer Sanctions [ABA Standards] in considering a sanction. The Board has been using the Standards in recommending sanctions to us in other cases.[3] We have considered the application of the ABA Standards here and find them helpful. Standard 3.0 provides that in imposing a sanction the Court should consider (a) the duty violated; (b) the lawyer's mental state; (c) the actual or potential injury caused; and (d) the existence of aggravating or mitigating factors. Among the aggravating factors present in this case are the prior disciplinary offenses, the multiple offenses and the vulnerability of the vic-

---

[3] In connection with the brief, the Board submitted an affidavit of its vice-chair concerning events that transpired in the case for which respondent was publicly censured along with the vice-chair's view of respondent's conduct. Respondent has moved to strike the amicus brief of the Board, to strike the affidavit and the attachments to it as well as references to those materials in the brief, and to impose sanctions on the members of the Board.

We agree that the affidavit and attachments should have been submitted to the committee and it cannot be submitted to this Court. Accordingly, we will grant the motion to strike the affidavit and attachments. We have not considered those materials or the briefing based on those materials. The motions to strike the entire brief of the Professional Conduct Board and to impose sanctions on members of the Board are denied.

tims. See ABA Standards 9.22(a), (d), (h). Among the mitigating factors, applicable to at least some of the instances of misconduct, are the honest motive to help a client, respondent's personal difficulties, his forthrightness before the committee, and his relative inexperience. See ABA Standards 9.32(b), (c), (e), (f).

■ The violations of ethical standards present here are serious. They demonstrate a recklessness in dealing with opposing parties and witnesses aligned with opposing parties that is inconsistent with the fair administration of justice. Respondent's handling of his termination in the Yurenka case, including his response to his client's request for an itemization of charges, was vindictive and had the potential to cause great injury. In the aggregate, respondent's misconduct warrants suspension, especially since we have already imposed the highest non-suspension sanction for other misconduct.

The ABA Standards recommend that if a lawyer is to be suspended for professional misconduct, the suspension have a duration of at least six months. ABA Standard 2.3, Commentary. The rationale is that "short-term suspensions with automatic reinstatement are not an effective means of protecting the public" because rehabilitation cannot be shown in less than six months and a six-month duration is needed to protect client interests. *Id.* We agree and impose a suspension of six months in this case.

Under Administrative Order 9, as amended effective July 1, 1989, a lawyer who is suspended for a duration of six months or more is required to move the Professional Conduct Board for reinstatement and show: (1) the lawyer has the moral qualifications, competency and learning required for admission to practice; (2) reinstatement would not be detrimental to the integrity and standing of the bar or the administration of justice; (3) reinstatement would not be subversive to the public interest; and (4) the lawyer has been rehabilitated. A.O. 9, Rule 20(B), 20(D). Since the new rules do not apply to this case, we will not require that respondent seek reinstatement before he is again allowed to practice. We agree with the committee, however, that respondent must demonstrate study and knowledge of legal ethics. Thus, we condition reinstatement at the end of suspen-

sion period on respondent taking and passing the multistate professional responsibility examination.

The misconduct found with respect to Count II(C) of the presentment shows that respondent did not have in place a time-record and billing system that allowed him to give clients an itemized statement of work done. We also condition reinstatement on respondent demonstrating that he will practice in an office where a system is in place that will enable him to provide itemized statements to clients.

Compliance with the two reinstatement conditions shall be determined by the Professional Conduct Board. Reinstatement shall be by order of this Court on the expiration of the six-month suspension and the receipt of a determination of compliance with the reinstatement conditions by the Board.

■ *Judgment that Alan D. Rosenfeld is suspended from the office of attorney and counselor at law and from the office of solicitor in chancery for the period of six months, beginning November 18, 1991 and ending May 17, 1992, and thereafter until he demonstrates compliance with reinstatement conditions contained in this opinion.*