## In re Vincent Illuzzi

[632 A.2d 346]

No. 92-602

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed July 30, 1993

*Wendy S. Collins*, Special Bar Counsel, Montpelier, for Petitioner-Appellee.

*David Putter* of *Saxer, Anderson, Wolinsky and Sunshine*, Montpelier, for Respondent-Appellant.

**Per Curiam.** This case is before us a second time. In *In re Illuzzi*, 159 Vt. 155, 159–60, 616 A.2d 233, 236 (1992), we held that DR 7-104(A)(1) (lawyer shall not communicate with a represented party without consent of party's attorney) prohibits lawyers for plaintiffs from communicating directly with defendant insurance companies without the consent of the companies' counsel. We remanded the case to the Professional Conduct Board because the Board "failed to adhere to the requirements of its procedural rules when it adopted a second hearing panel report that had not been submitted to respondent." *Id.* at 156, 616 A.2d at 234; see Administrative Order No. 9, Rules 8C, 8D. That procedural deficiency was remedied when respondent was given an opportunity to address the panel's second report, which the Board again adopted. Respondent appeals anew on the grounds that there are procedural errors in the Board's decision; that the recommended sanction is too harsh because it is based upon an erroneous conclusion that he violated DR 1-102(A) and DR 1-102(A)(5); and that the Board failed to acknowledge certain mitigating factors, while considering inapplicable aggravating factors. Bar counsel responds by contending that the recommended sanction is too lenient in light of respondent's long history of unethical conduct and repeated violations of the Code. She recommends that respondent be disbarred or, at minimum, suspended from practice for three years as provided in A.O. 9, Rule 7A(2). We adopt the Board's recommendation that respondent be suspended from the practice of law for six months.

I.

We begin by chronicling respondent's prior disciplinary record and the incidents that led to the present petition. Respond-

ent was admitted to the Vermont bar in 1979. Shortly thereafter, he received his first reprimand for a disciplinary infraction. *In re Illuzzi*, 138 Vt. 621, 622, 413 A.2d 1220, 1220 (1980). Then a deputy state's attorney, he was cited for a traffic violation en route to work. The next day, his employer, the Orleans County State's Attorney, wrote a letter to the Washington County State's Attorney's office falsely stating that his deputy was responding to an emergency call regarding a homicide investigation when he was stopped for speeding. This Court publicly reprimanded respondent for requesting that his employer fabricate a story aimed at persuading another prosecutor to dismiss the ticket, or for acquiescing in the false account, in violation of DR 1-102(A)(4) (lawyer shall not engage in conduct involving dishonesty or deceit) and DR 1-102(A)(5) (lawyer shall not engage in conduct prejudicial to administration of justice). Respondent admitted to the falsity of the story and stipulated to the infraction after it became apparent that the story had been fabricated.

Less than a year later, respondent received a private reprimand after he stipulated to violating DR 7-102(A)(3) (concealing or knowingly failing to disclose that which attorney is required to reveal), DR 7-103(B) (failing to disclose existence of exculpatory evidence to counsel of criminal defendant), and DR 7-104(A)(1) (communicating with party known to be represented by counsel). In that instance, respondent, still a deputy state's attorney, was sanctioned after the Board found he should have known that a criminal defendant was represented by counsel, but nevertheless allowed the police to interview the accused without counsel present. Not only did respondent fail to seek permission for the interview from the defendant's attorney, he also failed to inform the attorney that the interview had occurred or to furnish the attorney with a copy of the supplementary investigation report that recounted the interview.

In 1983, respondent received another private reprimand for knowingly concealing facts, or making a false statement of fact, when he suggested to the court that his client, who had been released pending trial on other charges, remained incarcerated on the other charges. This conduct constituted another violation of DR 7-102(A)(3). Although a majority of the Board recommended a private reprimand, some members felt stronger

action should have been taken. The Board warned respondent that the violations were serious, that he had not acted within the standards of character and behavior expected of members of the bar, and that he must strictly adhere to the ethical standards set forth in the Code of Professional Responsibility.

In August 1987, respondent received yet another private reprimand after the Board accepted a stipulation between respondent and bar counsel stating that he had committed acts prejudicial to the administration of justice, in violation of DR 1-102(A)(5). In that incident, respondent had taken over a case from another attorney. Despite the fact that he knew his client's former attorney claimed part of any future settlement as payment for services rendered, respondent failed to notify the attorney when the case settled or to resolve the issue of attorneys' fees before disbursing the settlement funds.

The present allegations against respondent resulted from his representation of two plaintiffs in separate personal injury actions. In one case, respondent represented a woman injured in an accident while a passenger in a car driven by her husband. Respondent contacted the insurance company covering the vehicle, Travelers Insurance Company, and attempted to settle the matter with its claims supervisor, Linda Fritsch. When they could not agree on the value of the claim, respondent filed a lawsuit on behalf of the plaintiff in the summer of 1989, and Travelers retained a law firm to defend the claim. Respondent continued to communicate directly with Travelers, despite being told by Fritsch that the law firm had entered an appearance and that respondent should speak with counsel rather than the company. He sent letters on September 26 and 28, suggesting that Travelers' counsel had not expeditiously handled the case or made the company aware of the relevant law. In the second letter, respondent made the following statement: "If you want to keep the meter running on your legal costs and expenses in this case, that is a decision which is up to you."

When respondent did not cease direct contact with Travelers, Fritsch faxed him a letter on October 2, in which she reiterated that the company was represented by counsel and stated, "As such, I am at a loss to understand why you keep communicating directly with this office." Three days later, respondent replied:

I think you know very well why I am communicating with your office. I believe the manner in which this case has been handled both by your company and the law firm . . . may give rise to a bad faith action directly against Travelers and the law firm which you have retained. I need one further point of clarification. Is the law firm . . . representing the interests of Travelers Insurance Company?

Respondent telephoned Fritsch once again and was again told to contact Travelers' attorney. The last direct contact occurred on October 11, 1989, when respondent called Travelers and angrily demanded to know why the company's counsel had failed to show up for a deposition. Shortly thereafter, Fritsch advised the company's attorney to settle the bodily injury portion of the claim for the $20,000 policy limit.

The second incident giving rise to this disciplinary action again concerned respondent's representation of a plaintiff in a personal injury case. Government Employees Insurance Company (GEICO), which was represented by the same law firm that represented Travelers in the other action, insured the defendant in this second case. During the course of the trial in May 1987, defense counsel Lawrence Miller telephoned GEICO's claims representative, who informed him that respondent had just called and had suggested the company settle the case because the trial was going badly. Miller confronted respondent, expressed his dismay that respondent had called the insurer, and stated that both the defendant driver of the car and the insurance carrier were his clients and that respondent should not call GEICO. Respondent told Miller that he did not know that Miller also represented GEICO, and that had he known, he would not have called. He asked whether Miller was going to report him for an ethical violation. Miller responded that he "would accept his explanation at face value" and would not file a complaint with the Professional Conduct Board. Approximately two years later, while the case was pending on appeal, respondent again contacted GEICO by letter without Miller's permission. Miller then filed a complaint with the Board.

Based on these two incidents, the Board adopted the second panel's determination that respondent violated DR 7-104(A)(1), DR 1-102(A)(7) (engaging in conduct adversely reflecting on

lawyer's fitness to practice law), and DR 1-102(A)(5). In the first appeal, we rejected respondent's argument that DR 7-104(A)(1) should not be applied to prohibit contact between plaintiffs' lawyers and insurance company adjusters, holding that "the definition of 'parties' under the rule is not restricted to named parties in a lawsuit. The language of the rule suggests no limitation on the word 'party.' . . . The rule clearly prohibits direct contact without defense counsel's prior consent." *Illuzzi*, 159 Vt. at 159–60, 616 A.2d at 236.

## II.

The hearing panel found that respondent violated DR 1-102(A)(7) "when he disparaged Mr. Miller with the suggestion to the client that he was 'running the meter.'" Respondent argues that the petition did not provide adequate notice of a violation of this rule, that the rule is unconstitutionally vague as applied to the alleged misconduct, and that the Board's conclusion that he violated the rule is not supported by the evidence. We reject each of these arguments.

■ The petition cited a violation of DR 1-102(A)(7) with respect to both counts. Count II of the petition, on which the Board based the violation, states that respondent communicated directly with the insurer several times after the company specifically told him to direct his communications to its counsel for that particular matter. The petition alluded to the September 28, 1989 letter on which the violation was founded, noting that in the letter respondent challenged the insurer's legal position and insinuated that the company was wasting money on defense of the case. A copy of the letter was attached to the petition.

■■ Given these factual allegations, respondent received adequate notice of the charge against him. Rule 8C of A.O. 9 requires that the petition alleging misconduct be "sufficiently clear and specific to inform the respondent of the alleged misconduct." Attorney disciplinary proceedings, like other legal actions, require only that notice "inform the lawyer of the nature of the charges . . . in sufficient detail to permit the lawyer to prepare a defense." C. Wolfram, Modern Legal Ethics § 3.4.2 (1986); see *In re Wright*, 131 Vt. 473, 487–88, 310 A.2d 1, 8–9

(1973) (complaint in disbarment proceeding sufficient "if it fairly informs [respondent] of the nature of the misconduct"). Further, while basic due process rights regarding notice apply in disciplinary proceedings, *In re Ruffalo*, 390 U.S. 544, 550 (1968), the standard for what constitutes sufficient notice of the charge is generally lower than in criminal proceedings. *ABA/ BNA Lawyer's Manual on Professional Conduct* 101:2201 (1984).

Here, notice was not inadequate merely because the petition did not specifically allege that the statements made in the September 28 letter violated DR 1-102(A)(7). The panel found violations based on the conduct described and the disciplinary rules cited in the petition. We find no violation of due process.

■ Nor is DR 1-102(A)(7) unconstitutionally vague or overbroad. The generality of the phrase, "conduct that reflects on fitness to practice law," does make the rule susceptible to varying subjective interpretations. *ABA/BNA Lawyer's Manual on Professional Conduct* 101:1001 (1987). Nevertheless, the rule has survived due process challenges not only because of the impossibility of enumerating every act that might constitute a violation of professional standards, but because "the everyday realities of the profession and its overall code of conduct provide definition for this type of phrase and thus give adequate notice of which behavior constitutes proscribed conduct." *Id.* We are not persuaded by respondent's argument, and his brief cites no case law in support of his constitutional challenge to DR 1-102(A)(7).

■ Respondent also claims that the evidence does not establish that he disparaged attorney Miller by making the "running the meter" comment in the September 28 letter. We agree that this isolated comment, in and of itself, does not clearly disparage Miller. In isolation, the comment appears to be nothing more than a self-serving statement advising Travelers to stop spending time and money defending against the claim. The Board's finding that respondent disparaged attorney Miller, however, is supported by the letter in its entirety and by an earlier letter. Respondent states in the September 28 letter that he felt the company "should be aware of" statutory and case law in Vermont relevant to the then pending case, including the

repeal of a statute that might have favored the insurer. The letter warns the insurer that it is "charged with the responsibility of knowing the law in the State," and suggests that the company was wasting money by "keep[ing] the meter running on . . . legal costs." Respondent also mentions that he had given notice of a deposition to "your legal counsel."

The letter was a "follow-up" to another letter respondent had written to the insurer two days earlier, in which he stated (1) he was not aware of any legal authority supporting the insurer's position, (2) attorney Miller's law firm had filed an answer to the complaint without even contacting the insured motorist it represented, and (3) "well after" filing the answer, the firm finally interviewed the insured, who provided information that undermined the insurer's position.

Thus, examined in its entirety and in light of the previous letter, the September 28 letter directly suggested that the insurer's law firm had failed to apprise the insurer of the law governing the case; that this failure had exposed the company to a bad faith claim; and that, given the state of the law, the company's legal expenses were a waste of resources. The thinly veiled insinuation in the letter was that the law firm was profiting from its failure to fully inform the insurer of the state of the law governing the case. We conclude that there was sufficient evidence for the Board to find that respondent disparaged attorney Miller.

### III.

Respondent also argues that the evidence does not establish that he violated DR 1-102(A)(5) (conduct prejudicial to the administration of justice). Respondent was charged with violating this disciplinary rule only as to Count II, the matter concerning Travelers. The panel concluded that he violated the rule by his unauthorized direct contact with the insurer. The panel based the violation on respondent's "repeated pattern of conduct," not merely one isolated incident. Following the commencement of the Travelers lawsuit, Ms. Fritsch found it necessary to inform respondent, both orally and in writing, that the insurer had obtained counsel, who would handle further settlement negotiations. After making this point both indirectly and directly, to no avail, Fritsch wrote, "I am at a loss to understand

why you keep communicating directly with this office." Nevertheless, respondent continued to contact the insurer directly, without consent or notice to counsel. The Board's conclusion that respondent's actions demonstrated a "pattern" of misconduct was supported by the evidence and sufficient to establish that he violated DR 1-102(A)(5).

## IV.

█ Next, respondent argues that the Board improperly considered his prior disciplinary infractions in determining the recommended sanction. According to respondent, the Board's reliance upon the prior infractions as an aggravating factor violated due process and the prohibition against retrospective laws because, at the time he "incurred" the prior reprimands, A.O. 9, § 3(e) permitted the Board to consider only prior infractions filed in the previous three years. As amended, effective January 1, 1982, former A.O. 9, § 3(e) read:

> A record of the issuance of a public reprimand, public censure or admonition shall be maintained by the Professional Conduct Board for a period of three years from the date of its filing. If during that period of time the Board conducts new proceedings involving an attorney who has been publicly reprimanded, publicly censured or admonished, the Board may consider that previous public reprimand, public censure or admonition as evidence of a continuing pattern of misconduct so as to support a recommendation of discipline in the proceeding then pending and to support the discipline recommended.

This provision was deleted by an order, effective July 1, 1989, generally amending the rules governing the operation of the Board. Since July 1989, there has been no limit on the Board's, or this Court's, consideration of prior violations. See A.O. 9, Rule 7B ("Prior findings of misconduct may be considered by the Board or the Court in imposing sanctions.").

We conclude that the Board properly considered the prior infractions in determining the appropriate sanction. First, respondent incorrectly states that § 3(e) was in place at the time he "incurred" each of the four prior reprimands, and that all four of the prior infractions predated the instant proceedings

by more than three years. The first two infractions were found in February and November of 1980, while the first version of the three-year rule became effective on June 4, 1981. Respondent contends, however, as stated in his affidavit presented to the Board, that the then bar counsel induced him to stipulate to the November 1980 reprimand by representing that an impending rule change would preclude consideration of infractions more than three years old. This contention, which was refuted by the bar counsel, was not pursued before the hearing panel; therefore, we will not consider it here. See A.O. 9, Rule 8D ("The record created before the hearing panel shall be the record submitted to the Board.").

Moreover, respondent's assertion is incorrect because the stipulation that led to the 1987 reprimand was accepted in August 1987, before any formal petition was brought. Accordingly, the Board could have considered it, even assuming the three-year rule applied here, because the petition in the present proceeding was filed in March 1990, less than three years after the 1987 stipulation. Thus, the 1983 infraction is the only prior offense that was both found while the three-year rule was in place and filed more than three years before the present petition.

Apparently, respondent would have the Board apply the three-year rule retroactively to cover the two 1980 reprimands, but not apply A.O. 9, Rule 7B retroactively to cover the 1983 and 1987 reprimands. To justify this position, he claims that allowing the 1989 amendment to expand a jeopardy period that had already run would impair his "vested" right to the limited three-year jeopardy period guaranteed by the former A.O. 9, § 3. Thus, he argues, this situation is distinguishable from *Carpenter v. Department of Motor Vehicles*, 143 Vt. 329, 333, 465 A.2d 1379, 1382 (1983), where the plaintiff had argued that the penalty for refusal to submit to a breath test was improperly enhanced, pursuant to an amended statute, because the commissioner had considered DUI convictions that preceded the amended statute. We held that as long as the triggering act, in that case the refusal, occurred after the effective date of the amended statute, consideration of the prior convictions for enhancement purposes was not improper because there would have been no impact on the plaintiff absent the triggering act. *Id.*; see *Erno v. Commissioner of Motor Vehicles*, 156 Vt. 62, 65–66, 587 A.2d 409, 412 (1991) (applying same rationale).

We conclude that *Carpenter* permits retroactive application of A.O. 9, Rule 7B because A.O. 9, § 3 never precluded the Board from considering prior disciplinary offenses as an aggravating factor in determining' the appropriate sanction for current violations.[1] Section 3 provided that, during a three-year period following the issuance of a reprimand, the Board "may consider that previous public reprimand, public censure or admonition *as evidence of a continuing pattern of misconduct* so as to support a recommendation of discipline in the proceeding then pending and to support the discipline recommended." (Emphasis added.) Certain violations of the disciplinary rules may be grounded on a "pattern of misconduct," as was the case here regarding DR 1-102(A)(5). See *State v. Dixon*, 664 P.2d 286, 289–90 (Kan. 1983) (violation of rule proscribing neglect of client matters may be grounded on pattern of conduct with single client or consistent practice involving multiple clients). Thus, on its face, the three-year rule prohibited the use of prior offenses only insofar as those offenses demonstrated, when considered in conjunction with conduct that triggered the current petition, that the respondent's actions constituted a "pattern of misconduct" in violation of one of the disciplinary rules.

The rule, however, does not prohibit the consideration of prior offenses as an aggravating factor in determining the appropriate sanction for the current violations. Cf. *In re O'Dea*, 159 Vt. 590, 599, 622 A.2d 507, 513 (1993) ("The Board, by agreeing not to charge respondent with a pattern of misconduct, did not waive consideration of the transcripts from noncharged cases as aggravating factors in determining the severity of the charged violations and the proper sanction."). In *O'Dea*, we distinguished between using prior misconduct for the purpose of showing a pattern of misconduct and using it to enhance the sanction for the cited violations. *Id.* at 599, 622 A.2d at 513. We noted that, aside from its role in demonstrating a pattern of behavior, prior misconduct is important to consider in disciplinary proceedings in order to tailor the sanction to the

---

[1] Respondent argues that another reason *Carpenter* and *Erno* do not apply is because the triggering act for one of the counts of the current petition predates the effective date of A.O. 9, Rule 7B by two weeks. Assuming that respondent's dates are correct, the fact that the triggering act for the other count occurred after the amended statute makes his point irrelevant.

individual offender and the administration of justice. *Id.* at 599–600, 622 A.2d at 513. Here, the Board considered the prior infractions as an aggravating factor in determining the appropriate sanction for the *current* violations, not as constituting a separate violation based on "a pattern of misconduct," when considered in conjunction with the conduct that led to the instant petition. Therefore, it violated neither A.O. 9, § 3 nor due process.

Further, assuming the three-year rule precluded the Board not only from considering prior offenses in finding a current violation based on a pattern of misconduct, but also from considering prior offenses as an *aggravating factor* demonstrating a pattern of misconduct, we still conclude that the Board did not violate the rule here. In its *Standards For Imposing Lawyer Sanctions* (1991) (ABA Standards), the American Bar Association considers "prior disciplinary offenses" and "a pattern of misconduct" to be distinct aggravating factors. Standard 9.22(a) and (c); see Standard 8.0 (in addition to warranting special attention that may result in severe sanctions, engaging in previously sanctioned conduct "may also demonstrate a pattern of misconduct that will serve as an aggravating factor").

This interpretation of the three-year rule makes sense. In considering whether certain incidents constitute a pattern of misconduct, it is appropriate to limit the time frame in which those incidents occur. The administration of justice and the protection of the public are not served, however, by limiting consideration of prior offenses, regardless of when they occurred, for the purpose of determining the proper sanction of the current violation. See *People v. Barber*, 799 P.2d 936, 941 (Colo. 1990) (four prior disciplinary violations issued from 1973 to 1981 were not so remote in time that grievance committee was precluded from considering them in aggravation of violation arising from conduct occurring in 1984 and 1985). To the contrary, as noted, it is important to consider prior infractions in order to tailor the sanction to the individual engaging in the misconduct to protect the proper administration of justice.

We also reject respondent's argument that because the factual situation underlying the instant infraction differs from that of prior ones, it was improper to consider those previous transgressions, and thus the sanction is unwarranted. The similarity

of infractions may affect the weight given to them, but any disciplinary history is relevant to the lawyer's general fitness to practice law. Finally, we are not foreclosed from publicly disclosing prior misconduct merely because it resulted in a private sanction. *In re Clark's Case*, 619 A.2d 220, 220 (N.H. 1992).

## V.

■ We need not address in detail respondent's arguments that (1) the Board erred, on remand from the first appeal, by "readopting" the findings in the second panel report rather than making further findings and conclusions, and (2) the inconsistency between the findings of the panel's first and second reports demonstrates that the findings were not supported by clear and convincing evidence. We find no error in the Board "readopting" the panel's second report after respondent was given an opportunity to address that report. In any case, it is unclear what remedy respondent seeks. He states in his brief that he wishes this Court to address the *legal* issues not addressed by the Board, *without further remand*. Even if we were to conclude that on remand the Board should have made findings and conclusions concerning the issues raised by respondent, respondent essentially has conceded the lack of prejudice.

Regarding the second argument, respondent does not claim that the hearing panel violated the rules by issuing a second report. The fact that the findings in the second report differed from the findings in the first report does not demonstrate, in and of itself, that the amended findings were not proved by clear and compelling evidence.

## VI.

■ Respondent contends that the Board should have considered as a mitigating factor that direct contact between attorneys and adjusters, even if unethical, is the standard custom and practice in the insurance business in Vermont. Respondent points out that in its first report, the hearing panel stated that "there is a clear practice in the Plaintiff's and defense bar in Vermont of allowing such contact," and that in its second report, the panel again acknowledged that the practice occurs in Vermont, stating that there was "considerable evidence" of its existence. We find little merit to this argument. As we stated in the previous appeal:

> Given the absence of ambiguity in the rule, we find irrelevant respondent's contention that it is the common and accepted practice for Vermont attorneys to have direct contact with insurance companies whose defense counsel have not consented to such contact. Moreover, we note that the testimony on the practice of insurance attorneys in Vermont is in conflict.

*Illuzzi*, 159 Vt. at 159, 616 A.2d at 236.

More importantly, as the hearing panel stated in its second report, this case concerns "unauthorized contact between Plaintiff's counsel and insurance adjusters after Plaintiff's counsel has been told not to contact the adjuster," not merely the practice of direct contact between plaintiff's counsel and insurance adjusters. Respondent did not simply follow what he perceived to be Vermont custom and negotiate directly with the insurer. Rather, he purposely bypassed opposing counsel, despite requests by the insurer and its counsel that negotiations be through counsel only. This fact alone distinguishes respondent's behavior from direct communication with the insurer early on, before defense counsel has entered an appearance.

We are not persuaded by respondent's argument that his honest ignorance of an ambiguous rule should be a mitigating factor. Not only was he repeatedly told by at least one adjuster and one attorney to communicate directly with the company's counsel, but he was also warned that his conduct in that regard might constitute a violation of the ethical rules. Further, some of his actions and comments suggest his awareness that his conduct was unethical. For example, the panel found that respondent asked attorney Miller whether Miller was going to report him to the Board for calling the insurer during a trial and trying to procure a settlement, despite the fact that he had agreed to negotiate directly with Miller. Moreover, respondent's ignorance-of-the-law argument carries little weight in light of the Board's prior warnings that he must familiarize himself with the ethical rules.

Nor do the circumstances leading up to respondent's last contact with GEICO constitute a mitigating factor. Even assuming a representative of GEICO initiated the contact and Miller knew about that contact, given the prior history of the case,

respondent was obligated to make a call or write a letter to attorney Miller to confirm that the contact was permissible.

## VII.

Finally, respondent contends that a six-month suspension from practice exceeds the gravity of his violations. He bases this contention on his claim that the violations were unknowing and that there was no actual or potential injury. We conclude the Board's recommended sanction is appropriate under the circumstances of this case.

First, as noted above, we are not persuaded by respondent's claim that the violations were unknowing. Given his past experience, his prior disciplinary history, the Board's prior admonitions concerning his need to review the disciplinary rules, the repeated signals respondent received that his conduct was improper, and his own actions and communications, his characterization of his lapses in this case as negligent understates his culpability.

Regarding the actual or potential harm, we recognize that respondent directly contacted relatively sophisticated insurance adjusters rather than vulnerable litigants who might be more susceptible to manipulation. We also acknowledge that, despite the testimony of attorney Miller and his partner that respondent's conduct had damaged the firm's reputation and adversely affected their business with GEICO and Travelers,[2] the evidence on this point was disputed. Nevertheless, we cannot conclude that respondent's conduct did not cause, at minimum, potential injury to a party or interference with a legal proceeding. Indeed, regardless of whether he was successful, as some witnesses believed,[3] his conduct was aimed at interfering

---

[2] Attorney Miller testified that respondent's communications had produced a "chilling effect" on his firm's relations with representatives of both insurers. Mr. Miller's partner testified that he felt respondent's disparaging comments had caused Travelers to shift some of its legal work to another firm.

[3] Attorney Miller's partner testified that respondent's harassing conduct resulted in Ms. Fritsch ordering him to prematurely settle a claim that was not likely to prevail. Ms. Fritsch also testified that respondent's intimidating and harassing behavior had caused her to advise the company's counsel to settle the case.

with a pending legal proceeding by circumventing defense counsel.

Even assuming respondent's conduct was merely negligent and there was little or no injury to the client, a public reprimand would be the appropriate sanction, absent mitigating or aggravating circumstances. Standard 6.3 of the ABA Standards governs violations for "improper communications with individuals in the legal system." According to the commentary of Standard 6.33, most courts impose reprimands on lawyers who negligently, but unknowingly, engage in improper communications. The commentary cites *In re McCaffrey*, 549 P.2d 666, 668 (Or. 1976), where the court imposed a public reprimand on a lawyer who unknowingly communicated with a party represented by counsel. Moreover, if we were to conclude that respondent's conduct violated only "duties owed to the profession," see ABA Standards 7.0, a public reprimand would be the proper sanction, absent aggravating or mitigating circumstances. According to the commentary of Standard 7.3 of the guidelines:

> Reprimand is the appropriate sanction in most cases of a violation of a duty owed to the profession. Usually there is little or no injury to a client, the public, or the legal system, and the purposes of lawyer discipline will be best served by imposing a public sanction that helps educate the respondent lawyer and deter future violations.

██ Had this been respondent's first violation of the ethical rules, a public reprimand would have been an adequate sanction. But given respondent's numerous prior disciplinary offenses, suspension from practice is necessary. See *In re Rosenfeld*, 157 Vt. 537, 547, 601 A.2d 972, 978 (1991) (lawyer's misconduct warranted suspension because this Court had "already imposed the highest nonsuspension sanction for other misconduct"); *Florida Bar v. Glick*, 397 So. 2d 1140, 1141 (Fla. 1981) (attorney who exhibits cumulative misconduct must be dealt with more severely). The fact that we have now sanctioned respondent five times is particularly disturbing, considering the number of attorneys in this state and the relatively few number

of sanctions imposed by this Court in past years. In 1980, the year respondent received two separate sanctions, the only other sanctions imposed by this Court were three private admonitions. The sanction respondent received in 1983 was the only one imposed that year. In 1987, only four other attorneys were disciplined. Only one other attorney in this state has been disciplined five times since 1968.

Not only has respondent been disciplined on four prior occasions, but he has previously violated DR 7-104(A)(1) and DR 1-102(A)(5). See ABA Standard 8.2 (suspension is appropriate when lawyer has been reprimanded for same or similar acts and engages in further acts that cause real or potential injury). Although the circumstances of the two violations are not identical, the underlying provisions have remained the same. Respondent's repeated violations make it apparent that he has failed to familiarize himself with the profession's code of conduct and to conform his behavior to that expected of the profession. His cumulative disciplinary record demonstrates a cavalier attitude toward the profession's ethical practices and warrants suspension from the practice of law.

*The decision of the Professional Conduct Board is adopted and its recommendation for discipline is approved. Vincent Illuzzi is suspended from the practice of law for the period of six months, beginning September 1, 1993, during which time he shall successfully complete the multi-state professional responsibility examination.*

**Allen, C.J.,** dissenting. I dissent from the sanction imposed because I believe it to be too severe. We have said that the purposes of sanctions are to protect the public from persons unfit to practice, to maintain public confidence in the bar and to deter others from similar conduct. *In re Berk*, 157 Vt. 524, 532, 602 A.2d 946, 950 (1991). The infractions found do not reflect upon respondent's fitness to practice law. They resulted from his erroneous belief that it was not improper to make direct contact with insurers that had retained counsel to represent their insureds. While we proscribed such contact in *In re Illuzzi*, 159 Vt. 155, 159-60, 616 A.2d 233, 236 (1992), the line had not been clearly drawn before that decision and respondent's belief was not totally unfounded. Indeed, we were able to find support for

the holding only from a United States district court and a state intermediate appellate court.

The relationship between an insurer, insured, and counsel retained for the insured by the insurer is confusing at best.[1] At the outset, the insurer and insured usually have a shared interest to successfully resist or settle a claim. This common interest permits the retained lawyer to represent ethically both the insurer and the insured in litigation. Difficulties arise when conflicts develop between the interests of the insurer and of the insured, such as a claimed lack of cooperation, claims made in excess of the policy limits, or receipt of information by the attorney that might relieve the insurer of the obligation to defend. When such conflicts arise, the attorney's sole loyalty and duty is to the insured.

The potential for conflict was great in the Travelers case because the policy limits were low and a wife was suing her husband. Respondent's inquiry as to whether the attorneys retained to represent the insureds were also representing the Travelers is understandable and should bear on the question of whether the conduct was knowing under the American Bar Association Standards and should also be considered in mitigation.

The offending letter in GEICO was sent after GEICO had contacted respondent in an attempt to settle a companion case being defended by Mr. Miller and arising out of the same accident. During these negotiations, GEICO was also attempting to dispose of the earlier case that had gone to judgment. Although I agree that under the circumstances respondent should have obtained Mr. Miller's consent to discuss settlement of the earlier case directly with GEICO, I don't believe the conduct was so egregious as to warrant the sanction of suspension.

I also do not believe that public confidence in the bar is undermined by wholly private contacts between attorneys and employees of insurance companies. The practice exists and undoubtedly will continue. Our determination that the disciplinary rule requires that such contact be consented to does not

---

[1] It has been said that the relationship between the insurer and the retained attorney is not that of attorney and client. *Atlanta Int'l Ins. Co. v. Bell*, 475 N.W.2d 294, 297 (Mich. 1991).

imply that public confidence in the bar is undermined where contact is made without consent. The duty owed was to the profession, not the public.

Respondent was disciplined by the Board for violations of three rules: DR 7-104(A)(1), "by communicating with persons of adverse interest"; DR 1-102(A)(7), "proscribing conduct adversely reflecting on a lawyer's fitness to practice law, when he disparaged Mr. Miller"; and DR 1-102(A)(5), for "conduct that is prejudicial to the administration of justice by this repeated pattern of contact." With respect to the latter violation, the contacts arguably were not misconduct when committed. Their repetition adds nothing to the discussion. The majority has concluded, and I agree, that Mr. Miller was not disparaged by the "meter running" letter.

I also do not agree that Standard 6.33 of the American Bar Association Standards applies to the violations found. This standard applies to violations for "improper communication with an individual *in the legal system.*" American Bar Association, *Standards for Imposing Lawyer Sanctions* (1991) (ABA Standards) (emphasis added). It is intended to punish attempts to influence a judge, juror, prospective juror, witness or other official, and does not apply to the facts before us.

The appropriate sanctions for improper communications are set forth in 7.0 of the ABA Standards. "Admonition is generally appropriate when a lawyer engages in an isolated instance of negligence in determining whether the lawyer's conduct violates a duty owed to the profession, and causes little or no actual or potential injury. ABA Standard 7.4. Suspension is generally appropriate when a lawyer knowingly engages in such conduct with resulting or potential injury. ABA Standard 7.2. Thus, the issues are whether respondent acted knowingly or negligently and the magnitude of any injury. "Negligence" is defined as "the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." ABA Standards at 7. "Knowledge" is defined as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." *Id.* The respondent failed to heed the risk, and his conduct more closely fits the negligence definition.

In determining an appropriate sanction we should consider, in addition to the duty violated and the lawyer's mental state, the potential or actual injury and the existence of aggravating or mitigating factors. ABA Standard 3.0. The only injuries suggested are that the Travelers paid the policy limit on a claim that the adjuster thought could be successfully defended because respondent had intimidated the adjuster and that respondent's direct contact had a "chilling effect" on the law firm's relationship with two insurers. The adjuster, Linda Fritsch, testified that at the time she advised the attorney employed by Travelers to settle the case, she "wasn't as sure as I might have been originally that we would have been successful," and she was questioning the decision to deny liability. The adjuster was an experienced assistant manager handling property and casualty claims. There is no claim, or even suggestion, by the insurer that it paid more than the claim was worth.[2] The evidence established and the hearing panel found that insurers routinely have their adjusters contact plaintiffs' attorneys after they have retained defense counsel. It is difficult to comprehend how the insurer is not injured by this practice while at the same time is injured simply because retained counsel for the insured has not granted permission for the contact.

Although attorney Miller testified that he thought there had been a chilling effect on his firm's relationships with the two insurance carriers after the contact by respondent, there was no testimony from the insurers that this was the case. At the time of the hearing in this matter, attorney Miller had been handling cases for both carriers for twenty-five years. He is an experienced and competent trial attorney. His firm continues to handle cases for the carriers, including the unresolved pieces of the case from which the complaint arose. It is inconceivable that an ethics violation by another attorney could impact on this relationship. In short, actual or potential injury is virtually nonexistent. The absence of a knowing violation, combined with the absence of actual or potential resulting injury, suggests the

---

[2] The first report of the hearing panel made the following finding: "The panel is unpersuaded that there was damage to Linda Fritsch. The panel believes that insurance adjusters are sophisticated enough to know what should and should not be done in this area."

sanction of admonition under the ABA Standards, absent aggravating factors. ABA Standard 7.4. Even the application of ABA Standard 6.33 would not warrant suspension as there has been no showing that the respondent knew the communication was improper and no showing of injury or interference.

The final consideration for the Court in imposing a sanction is the existence of aggravating or mitigating factors. ABA Standard 3.0(d). Aggravating circumstances are any considerations that may justify an increase in the degree of discipline to be imposed and include prior disciplinary offenses. ABA Standards 9.21, 9.22. I agree with the majority's characterization of respondent's past disciplinary record and conclude that this record warrants a greater punishment than admonition; I would impose a public reprimand.